IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| SOUTHWEST DEALER SERVICES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 11-0711-CV-W-ODS |
| ) | |
| JESSE LITTLE, ) | |
| ) | |
| Defendant. ) | |

**ORDER AND OPINION DENYING PLAINTIFF'S MOTION
FOR TEMPORARY RESTRAINING ORDER**

Pending is Plaintiff's Motion for Temporary Restraining Order. A hearing was held on July 28, 2011. Both sides also presented written arguments in support of their respective positions. After considering these matters, the Court hereby denies the motion (Doc. # 2).

## I. BACKGROUND

Plaintiff is a Kansas Corporation with its principal place of business in Kansas. Plaintiff is in the business of selling after-market products (such as vehicle service contracts, paint protection, and security devices) to car dealerships in Nebraska, Iowa, Kansas, Missouri, and Northeast Oklahoma. Defendant is a Missouri citizen who worked for Plaintiff as a sales representative until he was terminated on June 29 or 30, 2011.

### A. The Recordings

Plaintiff conducted monthly meetings attended by its sales representatives (including Defendant), the Office Manager (Cathy Peirceall), and the President (Bill Wilson). Topics discussed during these meetings included (but were not necessarily

limited to) matters related to the cost and pricing of products sold by Plaintiff, sales representative commissions, and other matters related to customers. Defendant recorded sixty to eighty hours of these meetings; he testified he did this because he felt a need to have some sort of record because he previously had disputes with Wilson about the instructions and directives issued during these meetings.

After being terminated, Defendant e-mailed Steve Alderson, Plaintiff's majority owner,[1] advising him that he had made these recordings. The e-mail included an excerpt from one the recordings that lasted approximately thirty-five seconds. The recording is extremely difficult to understand, but according to Wilson it is his voice that can most plainly be heard, and he is making a statement to the effect that Alderson does not know certain unidentified numbers and that he makes them up.

Plaintiff also sent an excerpt from the recordings to the Finance Manager (J.S.) at Lee's Summit Mitsubishi. The excerpt sent to J.S. was approximately one minute and twenty-two seconds, and is even more unintelligible than the excerpt sent to Alderson. Wilson testified that the most intelligible voice is his, and he admitted it contains unflattering comments he made about J.S., some of which were based on information provided by Lee's Summit Mitsubishi's owner, Corey Matt. Plaintiff testified he sent the audio excerpt because he had been friends with J.S. for a long time. The Court is not convinced Plaintiff's motivations were so altruistic: he did not divulge Wilson's statement to his friend at the time they were made, but within two weeks of being fired he suddenly found it necessary to advise his friend of Wilson's comments. However, the Court also does not believe Defendant was motivated by animus toward Plaintiff; at worst, the Court believes Defendant was motivated by animosity toward Wilson, whom Defendant clearly did not like and did not get along with. Wilson is not a party to this suit.

Stubbs played the excerpt for Matt, who was upset not only by the comments but by the fact that Wilson divulged information Matt provided about J.S. in confidence. Wilson's statements have caused Matt to "reconsider" his dealership's relationship with

---

[1]Alderson owns 55% of Plaintiff's stock; Wilson owns the other 45%.

Plaintiff; they are still doing business, but he is entertaining offers from Plaintiff's competitors. When asked whether a decision to change to another vendor would be based on anything other than financial considerations, Matt's answer was not entirely clear.[2] Other than what has been said about Lee's Summit Mitsubishi, there is presently no reason to believe Defendant has played a part in any other customer's decision to sever its relationship with Plaintiff.

After being terminated, Defendant formed a company called Premier Dealer Services. He then contacted at least one of the vendors that supplied the aftermarket parts/services sold by Plaintiff (IAS) in an attempt to become a dealer of its products/services. Plaintiff confirmed that he is trying to work in this industry.

There is no evidence that Defendant has played any portions of the recordings for anyone else, and Defendant denies doing so. This means that approximately two minutes of the sixty to eighty hours have been divulged. Plaintiff does not know what is on the rest of the tapes; for that matter, neither does the Court. Defendant also testified that he has no plans to play any other portions for anyone else, and agreed that he no longer needs them to protect himself. While he has not offered to transfer them to Plaintiff, he has no objection to doing so.

B. Financial Information

Evidence was also presented regarding Defendant's access to confidential financial information. The dealerships that comprise Plaintiff's customers may have provided Plaintiff with documents revealing their costs (and other financial information), but the dealerships are not parties to this case. Moreover, it is not clear how secret the information is: dealerships seem willing to provide this information to vendors (and potential vendors, like Plaintiff) in order to negotiate acceptable terms for after-market products.

---

[2]The Court does not insinuate that Matt was evasive. The Court's impression is that Matt had not considered the issue before being asked, and did not really know what he would do.

This leads to Plaintiff's allegation that Defendant has access to Plaintiff's cost information, which constitutes trade secrets that Defendant cannot use. The Court is not persuaded that he has any such information. The Court also believes the information is too voluminous for Defendant to have memorized.

Plaintiff also contended Defendant could calculate Plaintiff's costs based on his pay stubs because the commission is based on percentages of Plaintiff's profit. However, the profit is widely varied because different prices were charged to different dealers for different products, and those prices also varied for each car model sold by each dealer. For Plaintiff's contention to be correct, its employees' pay stubs had to record the commission (1) for each product sold (2) for each model of car (3) on a dealer-by-dealer basis. The Court finds it hard to believe this much detail was provided on the pay stubs. The Court also notes Plaintiff – whose claim depends on this fact – did not present the Court with a sample pay stub to demonstrate the calculation could be performed.

## II. DISCUSSION

The Complaint asserts two causes of action: Count I asserts a claim for tortious interference with Plaintiff's contracts or business expectancies, and Count II asserts a claim for misappropriation of trade secrets. Count III does not assert a cause of action but only seeks injunctive relief; specifically, it seeks an injunction (1) prohibiting from disclosing or otherwise using Plaintiff's trade secrets, (2) limiting the extent to which Defendant can work in the industry, and (3) requiring Defendant to return the audio recordings to Plaintiff. In determining whether a plaintiff should be granted a temporary restraining order, this Court must weigh "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

A.

Before addressing Plaintiff's claims, it is necessary to address an argument raised by Defendant; specifically, that Plaintiff's claims are covered by an agreement to arbitrate. On May 7, 2007, Defendant (but, apparently, not Plaintiff) signed an Arbitration Acknowledgment, pursuant to which Plaintiff

> agrees that any dispute, claim or controversy concerning his employment or the termination of his employment or any dispute, claim or controversy arising out or relating to any interpretation, construction, performance or breach of this Agreement, shall be settled by binding arbitration.

Assuming this agreement is binding on the parties, the Court holds it is not applicable to the present case. The claims in this case do not concern terms, conditions, or other matters related to his employment or termination; they concern matters that occurred *after* his termination and that are disconnected from his employment. The only real connection between this case and Defendant's employment is the fact that Defendant was once Plaintiff's employee – which is not enough to bring the suit within the arbitration agreement's scope. The situation might be different if Plaintiff claimed Defendant stole information while he was employed (because then it would be a claim concerning his employment), but this claim is not made. While the recordings were not authorized, there is not even a claim that the act of recording sales meetings (or recording Wilson specifically) was independently wrongful.

B.

For ease of analysis, the Court will analyze a "phantom claim" first. Plaintiff's request for equitable relief includes a request to limit Defendant's efforts to compete with Plaintiff. Evidence was presented, and the argument was made, that Defendant should be prevented from competing with Plaintiff. However, neither Count I nor Count II would justify such relief. Moreover, there is no evidence Defendant signed a non-compete agreement, much less what the terms of that agreement might have been.

5

Given that covenants not to compete are to be strictly construed against the employer, e.g., Eastern Distributing Co. v. Flynn, 567 P.2d 1371, 1376 (Kan. 1977),[3] these evidentiary and procedural failings are fatal to Plaintiff's request for an order limiting Defendant's ability to work in the industry. The Court cannot conclude Plaintiff is likely to succeed on the merits of such a claim, and the public interest is not served by enforcing a nonexistent agreement.

C.

While Defendant may be free to compete with Plaintiff, he may not utilize trade secrets to do so. Customer lists can constitute trade secrets, e.g., Progressive Products, Inc. v. Swartz, 205 P.3d 766, 773 (Kan. Ct. App. 2009), but they do not automatically qualify as trade secrets. To be trade secrets, they (1) must derive economic value from not being generally known, (2) must be the subject of efforts to maintain their secrecy, and (3) must not be readily ascertainable. K.S.A. § 60-3320(4). Wilson testified that the identity of Plaintiff's customers is readily ascertainable and no efforts are made to keep them confidential. Therefore, the identity of Plaintiff's customers does not appear to be a trade secret. Plaintiff's cost and pricing information might qualify as trade secret, but as noted earlier the Court does not believe Defendant possesses this information.

Wilson explained that he believed the fact that he developed the relationships with the dealerships, and Defendant merely benefitted from those relationships by virtue of working for Plaintiff. This may be true; however, those relationships do not qualify as trade secrets. Those relationships may justify enforcement of a covenant not to compete – but, as stated in subsection II.B, there is no such covenant. These observations persuade the Court that Plaintiff is not likely to succeed on the merits of its trade secret claim.

---

[3]Plaintiff suggests, and the Court agrees (at least preliminarily) that Kansas law governs this dispute.

D.

The tort of interference with existing or potential business relationships requires proof establishing

> (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.

Burcham v. Unison Bancorp, Inc., 77 P.3d 130, 151 (Kan. 2003).  There is no indication Defendant has, or will, commit this tort.  Even if one assumes Defendant's actions will someday cause Lee's Summit Mitsubishi to sever its relationship with Plaintiff, there is no likelihood of success because, under Kansas law, making truthful statements or providing truthful information cannot support this tort.  Cohen v. Battaglia, 202 P.3d 87, 98-99 (Kan. Ct. App. 2009).  Wilson does not deny that the recording of his statements about J.S. accurately reflects what he said, so the fact that Defendant sent those statements to J.S. cannot constitute tortious interference with Plaintiff's business relationship with Lee's Summit Mitsubishi.[4]  Even if truthful information could form the basis for the tort, Defendant appears to have a legitimate business justification for interfering with Plaintiff's business relationships: he wants to compete for Plaintiff's business (which is permitted in the absence of a covenant not to compete).  Turner v. Halliburton Co., 722 P.2d 1106, 1117 (Kan. 1986).  For these reasons, the Court does not believe Plaintiff is likely to succeed on the merits of this claim.

E.

---

[4] Obviously, sending the excerpt to Alderson is of no legal effect: Defendant cannot interfere with the relationship between Plaintiff and Plaintiff's majority owner.

The Court recognizes its conclusions are based on an early presentation of the facts, and its observations do not represent the final word on these matters. However, the Court must decide whether to grant the TRO based on what the parties have presented, and the Record so far is not favorable to Plaintiff. In light of the unlikelihood of Plaintiff's success on any of its claims, none of its requests for injunctive relief appear justified. This leads to another conclusion relevant to the <u>Dataphase</u> factors: there also does not seem to be a threat of harm, much less irreparable harm, from anything Defendant may do in the future – at least, no harm for which a remedy exists.

The Court acknowledges the possibility that the recordings contain some confidential information. Even though Defendant contends he will not divulge the contents of the recordings to anyone else, an order insuring the recordings are not divulged to third parties is appropriate. Such an order works no hardship on Defendant in light of his stated intent to not play the tape, his admission that he does not need them any longer, and his statement that he does not oppose surrendering the tapes. Such an order is also an appropriate means for insuring any trade secrets that were recorded are not divulged. Accordingly, on or before the close of business on August 2, 2011, Defendant is instructed to deliver all copies, originals, and transcripts of the recordings to the Court. In the meantime, Defendant is prohibited from playing the recordings for anyone and from displaying any transcripts to anyone. In all other respects, Plaintiff's request for a TRO is denied.

IT IS SO ORDERED.

/s/ <u>Ortrie D. Smith</u>
ORTRIE D. SMITH, SENIOR JUDGE
DATE: July 29, 2011         UNITED STATES DISTRICT COURT